My name is Clay Grover. I represent the three appellants in this appeal, Mr. Meekins, Mr. Grosier, and Mr. Kinney. The appellants are three career educators and also public employees of a public school district. They've been sued for supervisory liability under Section 1983 arising from a female high school student's allegations that she had a sexual relationship with a teacher. And yet the central problem with the plaintiff, and what's appealed is the district court's denial of the appellant's motions to dismiss unqualified immunity. The central problem with the plaintiff's pleadings is that it's really based upon that these three individuals should be responsible for this constitutional violation because they're the captains of the ship at the high school. And yet we know that that is insufficient. Under ICPEL, more needs to be pledged, factual matter needs to be pledged to show that each one of these individual defendants, by their own action or inaction, caused the violation of the student's constitutional violations. Conclusory allegations and hyperbole are not sufficient. They have to allege specific factual allegations, and in this case, they do not. What are the facts with regard to each one of these defendants? What did they know and when did they know it? And that's sort of the old basic questions. Yes, and if you look at the district court's order, what he says the factual allegations pled were with Mr. Grosier, who was the associate principal there. We'll start with him. The facts alleged against him is that he saw the teacher and the student walking down the hall together. That he saw them sitting in class together. And that he... She's 16. She was 17. And that he, six years before this relationship, that Mr. Grosier had written a memo to this teacher, Mr. Coach McCutcheon, telling him, reprimanding him for allowing a student to drive his vehicle, six years before. He's now 39 years old. How old was he? I think he was in his early 30s at the time. And that he knew about current rumors. And the last thing was that he knew about rumors. And yet, the pleading with respect to rumors is purely that he knew of rumors of a sexual relationship without any factual allegations regarding the content of the rumor, when the rumor was received, who it was received by, anything that would judge the credibility of a rumor. And of course... I don't think Iqbal requires that kind of factual support on summary judgment. Even if we conclude, and of course in Iqbal, the allegation was that the FBI director and the attorney general knew of, approved, and condoned a discriminatory practice. And in this allegation, the allegation is purely that he knew of rumors of a sexual relationship. So... What did he do about that? We argue that it's conclusory, but... What did he do about the rumors? He didn't do anything about rumors, because rumors, by their own definition, is uncertain and doubtful truth. It's a report of uncertain and doubtful truth. Tell me a little bit about, quote, rumors. People are talking about a teacher in his 30s hanging out with or having sexual relationships with a 16 or 17-year-old student. And it's just rumors, so the principal says, well, those are just rumors. I'm not going to do anything. Well, and that's part of the problem, is that there's no factual allegations to give context to those rumors. We don't know where those rumors were coming from. Well, what were the rumors, though? Exactly. What were the rumors? You know, all he's pled is that he knew of rumors of a sexual relationship. And yet there's no context as to what those rumors were, what the content, who gave them, who reported that rumor to him. All of those would go into assessing the credibility of those rumors, which, again, are reports of doubtful truth. And so just the fact that you allege, well, he knew of rumors, without any more, can't because the element that they have to show under Doe v. Taylor is that they were aware of facts that plainly pointed to the conclusion of a sexual relationship between the student and teacher. Doubtful reports with no context provided in the pleading and the complaint, that can't be sufficient to put this defendant in jeopardy of having committed a violation of the student's rights. And, of course, seeing them in the hallway or sitting together in a classroom, that doesn't give rise to knowledge plainly pointing to the conclusion of a sexual relationship. And neither does a... What do you mean, sitting together in a classroom? Excuse me? What do you mean by sitting together in a classroom? What is alleged in his complaint is that they were sitting together in a classroom close enough that their knees were touching. But he's teaching the class? Yes, he's a... You've got a class in front of you, and he's at the desk, and she's up there in front of the class. I thought that was the situation, and that, in fact, she had missed hundreds of days of the class because she was with him. Yes, but there's no allegations that these three appellants knew about her attendance. And, you know, sitting next to him in the classroom, that does not plainly cause any reasonable person to walk by, and if you see a student sitting next to a teacher in the classroom, that any reasonable person is going to say, to which you've got a plausible claim to be able to read their complaint and say, yes, any reasonable educator who knew of those facts would automatically have concluded that they were engaged in a sexual relationship and then determine whether they were deliberately indifferent to that. And what we are asserting is that none of these appellants had information that would alert them to that. This case comes to us on appeal from a denial of a motion to dismiss, 1286 motion to dismiss? Yes. Yes. But under Iqbal, asserted qualified immunity, they have the burden, because there's policy reasons, not to allow the suit to go further if they can't plead sufficient facts. It would show that these appellants caused a constitutional violation. Now, the only additional with respect to Meekin, so with respect to Grosier, the memo from 2006 had nothing to do that would cause a person to say, oh, this person is having a sexual relationship. One, it was six years before, and it didn't involve. We have no discovery in this case. We do. We have had a year's worth of discovery in this case. And we have a year's worth of discovery depositions taken? There's been, I believe, between four and six depositions and thousands of documents given. We don't have the benefit of any of that. All we've got is a motion that just 1286 motion. Yes, but certainly the plaintiff had the benefit of all that discovery and depositions. They've been allowed to amend their complaint three times over the course of a year. And so yet here we are after substantial discovery in the course of a year, and a plaintiff still cannot allege sufficient facts to show that these people should be responsible under supervisory liability. The plaintiff also suggests that it goes to great length in their complaint to talk about a history of educators at that campus who had been arrested and prosecuted for sexual abuse. And yet while that may be relevant with respect to a claim against the school district itself as an entity, it certainly isn't relevant with respect to these particular individual appellants because there's nothing about any of those prior claims that involved this teacher or this plaintiff. And there's nothing about those that would suggest that this teacher and this plaintiff were engaged in a sexual relationship. If anything, what it shows is that when those type of relationships were discovered, they were investigated and arrested and prosecuted. Let's turn to Meekins. Meekins is the same allegations as Grosier with the exception of one additional allegation that he gave a warning to the teacher, McCutcheon, about his relationship with the plaintiff. And yet again, we would argue that that's somewhat conclusory in that it's too highly general. There's no substance given in the pleading about what the warning actually consisted of. I thought it was also an awareness of after-school socializing. Well, it's the same allegations that were made against Grosier. At best, the factual allegations against Meekins is that he saw them walking in the halls, he saw them sitting together in the coach's office. They assume merely because he was his football coach supervisor that he was aware of these memos from four and six years ago, and yet there's no facts to show that he was aware of those memos as his football supervisor when those were administrative memos. And then the last allegation is that he was aware of these rumors and that he warned him about his relationship. And yet the only aspect of that warning, okay, if I take that as a factual allegation that he warned him about the relationship, it doesn't tell me enough about what the content of that warning was, what motivated that warning. There are many alternative explanations for why he might have given Coach McCutcheon a warning, including that, hey, even if I've heard these rumors and I'm warning you, you need to be careful about how that is perceived. That would go to show that if all he knows is rumors, reports of doubtful truthfulness, and he gave a warning, that he isn't being deliberately indifferent to the knowledge that he had. That's the only difference from the allegations that he made against Grosier. Neither one of those would suffice under the Iqbal pleading standards. The allegations against the principal, and, of course, Meekins was the football coach. The allegations against the principal, Mr. Kinney, they are somewhat different. The allegation largely revolves around plaintiff alleges that she requested a meeting with the principal in the spring of that school year after she was involved in this sexual relationship. But what prompted her to meet with the principal was that she had heard a rumor from a student, or she had heard a report from a student that a teacher had said that the student was pregnant with the coach's kid. And that upset her, and she went to the principal specifically to tell him that she had heard that and that it was false and that she wanted him to put a stop to that. And yet the plaintiff suggests that somehow the principal is at fault because during that conversation he admitted that he had heard rumors. And yet they say, well, if he had heard rumors, he should have done something about it. And yet again, the rumors are of doubtful certainty. And two, the fact that she's in there denying rumors of a relationship between them, and yet now they're expecting despite her denial. I thought she went in and dispelled the rumor that she was pregnant. She did. And there were no other questions asked. That is correct. It sounds awkward to me to go in and say, I just want you to understand that I'm not pregnant, and I'm not pregnant by him. What certainly was never said is that she didn't have a sexual relationship with him. And the way that was handled, it seems rather strange to me that one wouldn't have serious concerns about exactly what the relationship was. Well, obviously, he was not giving any credence to any, quote, rumors that he had heard, and she's there denying a relationship that's being suggested. So while he may have been ineffective. I have a suggestion to you. A school official, a student in these circumstances, comes in and says, I just want you to know there's rumors about my being pregnant by the ex-teacher. That's not true. The natural question would be, what is your relationship with him? Wouldn't it? It would be. Was it asked? Well, they haven't pled one way or the other. So we don't know. All they say is that he said he had heard other rumors. She denied the rumor that she was pregnant and that he didn't take any action. So we don't know what his response was there. But what I'm suggesting is that just saying that he was aware of a report of doubtful rumors and then she's in there denying a specific rumor, we're supposed to suggest that, oh, he had enough information that he plainly needed to conclude that there was sexual. He needed to ask the question. That's all I'm suggesting. Obviously, that might have been more effective. But whether he was negligent or ineffective is not the case. It's whether he was deliberately indifferent based on the facts that he knew at the time. And in this case, based on the facts that he knew, we submit that he could not have been deliberately indifferent. All right, thank you, Mr. Crowley. You're safe time for rebuttal. Ms. Ford? May it please the Court. I'm Jacqueline Ford, and I'm here today for Brittany Terry, the plaintiff appellee in this case. I'd like to start out by talking where we left off, which is in regard to Principal Kinney and the facts alleged in the complaint that established both prongs of this test. Actually, the first prong of the Doe v. Taylor test is not even properly before the Court because it was waived below. In his motion to dismiss, Kinney states, and I'm quoting, assuming solely for the purposes of this motion that Terry's allegations against Kinney are sufficient to plead the first element of the Doe v. Taylor test, she nevertheless fails to plead, and he goes on to describe the second part of the test. Magistrate Smith's order, adopted by Judge Hittner, follows that lead and reiterates, Kinney did not challenge the first prong of the test. For purposes of the current motion, Kinney does not contest the first prong of the qualified immunity inquiry, i.e., that he learned of a fact or pattern of sexually inappropriate behavior. A third time, in their objections to the magistrate's recommendations, defendants again conceded this first prong of the test, writing, Kinney did not contest the first prong of the qualified immunity test solely for the purposes of this motion, and it's only now on appeal that they have raised that issue. Arguments not raised before the District Court are not properly before this Court, so for purposes of this hearing, I think the Court must assume that the allegations in the complaint established that first element, namely that Kinney had knowledge of facts plainly pointing to a sexual relationship. I'm happy to discuss that further with the Court, but assuming that point, I'd like to go forward to the second prong of the test with Principal Kinney, and that is his deliberate indifference. This Court has described deliberate indifference as somewhere between, somewhere higher than negligence but lower than intent. But I can hardly imagine a more intentionally, deliberately indifferent statement than, I'm aware of these rumors that you are having a sexual relationship with a coach on my staff, and those rumors will not be investigated, are not being investigated. Complete inaction, I think, is a whole new level of deliberate indifference. How funny he said, and you were not being investigated. Maybe I misread it. No, I believe the complaint states, again, I don't have the quote in front of me, but I believe the complaint states he is not being investigated, or it is not being investigated. But either way, whether it's particularly artfully drafted, the fact is that the principal indicated that there was not an ongoing investigation, that he had not initiated one prior to this meeting with Brittany, even though he previously knew about those rumors himself, and that even the fact that she had just said it's so common that a teacher has now blown it up into a pregnancy rumor and is discussing it down the hallway, even that did not prompt him to take any further steps, and he affirmatively told her that. So this appears to us to be the very definition of deliberate indifference. So we do think that we have met the pleading standards in regard to Principal Kinney fairly readily. I would ask the Court to consider the fact, too, that we're taking the Doe v. Taylor standards, which have been developed largely in the context of summary judgment cases, where the record has been fully developed, and we're now applying those at the early pleading stages of a complaint. The defendants have pointed out that this is the third amended complaint, but I think it's a bit of a red herring, and I'd just like to briefly review some of the procedural history there so the Court understands why it is that we could be so early in the process and yet be at a third amended complaint. The original complaint was filed in May of 2014. By agreement of the parties, a first amended complaint was filed a couple of months later in June of 2014. to clean up the original complaint. There were some claims removed, there were some defendants that were removed, and affirmative defenses that were also taken away in the response of pleading to that complaint. The second amended complaint was filed in September of 2014 because we were approaching the last day, pursuant to the Court's scheduling order, the last day to add parties. So at that point, defendants Meekins and Grosier were added to the complaint, but there were no additional factual allegations because discovery was ongoing. So it was an effort to meet the Court's scheduling order nevertheless. On February 16, there was a joint motion to extend the pleadings deadline because of ongoing delays from the school defendants in producing the electronic discovery that had been requested. We felt we needed that information in order to determine what the factual predicate was for the claims against these individual defendants in particular. So the deadline was extended to April 15, but we only received the first e-mail production from them of the ESI on April 8, and then again a second production on April 13, and by April 15 we had to have sufficient facts to amend this complaint in order to meet the deadline for amending the pleadings. I give the Court all that history because I don't want you to think that all these depositions and discovery that's been referred to all occurred before this complaint was drafted. All but one of the depositions in this case were conducted after the third amended complaint was filed. The only deposition taken prior to that was that of the plaintiff, Brittany Terry. In addition, there has been extensive production of documents in this case that is ongoing, but again most of that occurred right at or after the point that the third amended complaint was filed. With that in mind, I'd like to turn for a moment to the other two defendants, Meekins and Grosier, in this case. Again, our case is unique in some respects, and this one I think it is particularly so. I don't know of another case that's come before this Court where the individual requesting qualified immunity has witnessed with his own eyes on multiple occasions, in multiple locations, behavior clearly pointing toward a sexual relationship between a teacher or coach and a female teenage student. What were those things they witnessed? The complaint alleges, as the Court's noted earlier, that Brittany had 199 unexcused absences in a single school year. The complaint alleges specifically that she spent most of those absences in Coach McCutcheon's room. The complaint further says specifically that when she was in that room on those multiple occasions, she typically sat at or beside McCutcheon's desk, and that on most of those occasions she and McCutcheon were physically touching. She then goes on to allege in the complaint that on several different occasions, Meekins and Grosier both directly saw that. They saw her sitting in the classroom, and envision this if you can, a desk and a classroom full of students, one student. And again, it's not a third grader who sits up next to the desk with the teacher. This is a teenage girl sitting so close to the teacher on multiple occasions that they are physically touching each other in an open and notorious way, I would say, in front of a classroom full of students. In addition, Defendant Meekins specifically saw them in what's known as the football coaches office area. It's coaches plural. There's a number of football coaches there that have those offices. He saw them in that office together on multiple occasions, and on those multiple occasions sitting knee to knee with each other, again, somewhat reminiscent of the situation in the classroom. Apart from the question of what a female student is doing in the football coaches office area to begin with, the physical proximity is certainly highly suggestive and clearly pointing toward a sexual relationship between these two. In addition, Defendant Grosier saw them in the hallways together in the teacher's lounge. Now, I understand someone might say, well, wouldn't you always see teachers and students together in the hallways? What we're trying to describe there is, again, part of a package where you're seeing these two together all the time. That's the thing. Specifically as to Grosier, how many times did he see? Was it 2, 3, 10, 30? It makes a difference, it seems to me. Well, Your Honor, I agree it does make a difference, and we've said that there were multiple occasions when these things were cited. We don't have the precise number, and we're hoping as discovery gets further down the road we can be more precise on that. But I think, again, giving all inferences to the plaintiff and the pleading standards we have to meet, which are simply that a plausible claim is being stated, I think multiple occasions of direct view by this senior official in the school of this kind of contact and this type of, again, multiple instances of physical conduct highly suggestive of an inappropriate relationship I think is enough. And again, I do think that makes this case different from most others because we do have the direct vision that's happening here. In addition to that, there is the background of the whole circumstance by which these various interactions were viewed by these defendants, particularly Meekins and Grosier. Does the complaint say anything about the details of, the nature of, or the source of the rumors? It indicates that rumors had been heard. It does not indicate who the individuals were that told them. So when Principal Kinney, for example, told Brittany, I have heard rumors that you are having a sexual relationship with a coach, he did not tell her what the sources of those rumors are. We don't yet know that in discovery. We have reason to believe and allege in the complaint that there were rampant rumors in the school. At one point the complaint uses the term common knowledge, but we do allege specifically that they had heard those rumors. But we don't yet have enough discovery to know what days, who said them, or those further details. Each defendant had heard the rumors? Well, Principal Kinney has admitted that he had heard the rumors, and then the other two are specifically alleged in the complaint to have heard those rumors, yes. Meekins and Grosier both had supervisory responsibility for Shea McCutcheon, this coach. And so I think the court can impute knowledge of the prior reprimands for him that were in his file to them as his supervisory employee. Again, I would hearken to the Gilroy case. Any reasonably competent school official would have recognized the risk in this case, again, given all of those. There also had been a previous reprimand in 2008 given to Shea McCutcheon, the coach, for inappropriate communications with a girl named Brianna Hunter. She was a ninth grader at the time and, like Brittany, was not even enrolled in his class. That previous reprimand, again, was one that we believe that both Meekins and Grosier were familiar with. Getting back to the issue of the rumors, paragraph 114 of the complaint, Meekins knew of a multitude of rumors concerning McCutcheon having an improper sexual relationship with Brittany. Meekins also knew that McCutcheon specifically had a reputation in the school for liking young African-American females. Both Brittany and Brianna Hunter are African-American females. Again, this is not a race case. It's simply a descriptor of a pattern that was known to the school. Again, we think we can infer that, as the supervisor, Meekins would have been aware of the prior reprimands. Like Meekins, Mr. Grosier also is specifically alleged in the complaint to have been aware of McCutcheon's penchant for being attracted to young African-American girls. I don't think we can agree with the defendants in this case that a rumor can never be a fact. That seems to be their position because it's not yet substantiated. And yet, Dovey-Taylor itself is filled with rumors, and so are many other cases that this court has decided applying that standard. And that's the reason, too, I think, why state law requires reporting, not when you know of a sexual relationship, but when you know or suspect a sexual relationship. I don't know of any case in this court in which the court has said that the decision-maker, under Section 1983, on a qualified immunity basis, needs to wait until he actually sees them engaged in a sexual act before he has enough information clearly pointing to that. And instead, rumors have been an important part of what the case law has talked about. Case law is also referred to other background events. Specifically here, for example, in the five years before Brittany began being abused by Shane McCutcheon, there had been four criminal convictions of four different teachers in the school who had been criminally convicted for sex crimes involving students. Those were in 2007, 2008, 2011, and 2012. Those are all specifically mentioned in the complaint. All of those, three of those four incidents involved either a student athlete or a member of the coaching staff. And yet, when Brittany Terry told Principal Kinney, Brittany Terry, a volleyball star on the volleyball team, came in and said that she was just trying to deny she was pregnant with a football coach's child, one would think that that background and history would have been particularly important in that situation. And yet, Defendant Kinney did absolutely nothing. Moreover, we've also affirmatively pled things that could have been done and should have been done that weren't done, that all go to the deliberate indifference prong. For example, and I think there was discussion of this earlier, the court has pointed out, Defendant Kinney never asked Brittany, well, what's the nature of your relationship? Why would there be a rumor? I've heard rumors myself of a sexual relationship. Are you having such a relationship? Those basic common sense questions we've alleged in the complaint were never even asked and no further investigation was done. Similarly, the complaint alleges that Meekins and Grosher saw on a repeated basis highly suspicious behavior in a variety of settings all around the school area and yet never questioned Brittany and never made a report as required to state authorities. So again, deliberate indifference lies somewhere between the poles of negligence at one end and intent or purpose at the other. I think we are definitely well beyond the negligence standard here and have gone quite a bit further about that. It's also been mentioned, and it's mentioned in the complaint, that Defendant Meekins gave a verbal warning to McCutcheon regarding his relationship with Brittany and specifically, it's in paragraph 114, immediately following a discussion of some of the behavior he had witnessed, that paragraph includes the allegation that he gave a verbal warning to McCutcheon about continuing his relationship with Brittany. Now again, if we were at summary judgment, I would certainly expect the record to have a more complete description of what that warning was, what the nature was the warning was. Again, this Court has been clear that just because a step to attempt to address something isn't effective in stopping it doesn't necessarily in and of itself prove deliberate indifference. But in this case, given the, again, sort of open and notorious nature of what was playing out here, the idea that a verbal warning would have been an effective measure seems to us on the face of it to be something that would satisfy. Let me ask you a question. All these days that this young woman was a young girl was in the classroom with this teacher, and it wasn't her classroom. She wasn't in class. That means if she's there, she's not in the class she's supposed to be in. That's correct, Your Honor. So she's in the absent, and the truancy laws are pretty clear about that. Yes, they are. What does the record show, if anything, about what the school knew or should have known about her attendance in school? She's at school, but she's not in school, in effect, for purposes of truancy. She just shows up to a place and goes and stays in one place all the time. What does the record show about the awareness of any of these defendants about that fact? The complaint alleges that at the beginning of the school year, there was something of a scheduling snafu, and Brittany was not scheduled for a second period class. She had met Coach McCutcheon, and again, this is described in the complaint, at a summer camp, a power camp for athletes, previous summer, and he had begun a flirtation with her. So when she had her second period free, through conversation or some other means, she ends up, because she has no other class scheduled, she ends up just hanging out in the coach's class. Eventually, that scheduling error was corrected, and she was supposed to be in Spanish class at that time. But over the course of the year, on 199 occasions, she misses a class. Now, in fairness, some of those 199 would be, you know, a full day of classes that she might have missed from school. But those are 199 unexcused absences. And again, we've alleged in the complaint that the majority of those absences, by my math, that's over 100 classes, the majority of those times she was either in her unscheduled class period or she was missing Spanish class to go sit in the coach's room. Now, your question is the obvious one about where was the attendance system in this process. Again, some of this is beyond the face of the complaint, but I will tell you that the discovery in the case suggests that, for reasons unknown, the attendance system broke down. Brittany's mother was only notified on one occasion of an absence from class. So the parents weren't notified. The automatic reporting system required by the state to trigger the very truancy laws you've mentioned, Your Honor, also did not come into effect. And it's not clear yet why that happened in that way. But the fact is that I find it hard to believe, and I certainly think it's a very plausible claim at the 12B6 level of things, that any of these defendants seeing Brittany so frequently in a classroom, in a hallway, and I'd just like to point out the hallway, too, is the hallway outside this coach's classroom. Brittany's teaching a health class, but it's over in the sort of academic, I mean the athletic wing of the building. It's unusual for a child to be there with that much frequency in that particular area. Again, particularly when it's a football-oriented area in most respects, and she is not a member of the football team. McCutcheon had said, and this is in the complaint, that he was Brittany's mentor in the school's mentor-mentee program, and that gave him a certain amount of cover. I would just very quickly, I know my time is expiring, I just would like to say very briefly, the defendants have requested that this court deny leave to amend if they do grant any of the motions to dismiss. That issue was never briefed below because the court denied the motions to dismiss, so there was never any briefing on the issue of any further amendment of the complaint. Obviously, we don't think any further amendment is necessary, but we would request that the court, if it does grant any of the motions to dismiss, that it leave that issue to the district court to decide. All right. Thank you, Ms. Ford. Mr. Grover, you've saved time for rebuttal. Opposing counsel talked about seeing them walk in the hall or sitting in a classroom together close enough that their knees might be touching that any reasonable person would have plainly concluded that there was a sexual relationship, and yet what she doesn't tell you is that the plaintiff's own mother worked on that campus and saw the same thing. She did not conclude that there was a sexual relationship going on between her daughter and this coach, and if she didn't think that those things triggered that kind of conclusion, why would we expect that Did she know her daughter was absent 199 times and over half of those were in the coach's class? Well, if that's true. That's alleged. It's alleged. If that's true, I don't know what the mother knew, but opposing counsel didn't answer your question about what facts showed that any of these three appellants knew about her attendance. You know, they don't allege that Kenny or Grosier or the football coach Meekins were responsible for verifying attendance, so those facts of what her attendance were don't go to these three appellants at all. The question really was directed to the class that she was missing, and if she's absent a great deal of time in Spanish or whatever class she was cutting to get there, and that kind of absenteeism, I just wondered what's going on about that. It just struck me as being quite odd. It is odd. I think the explanations for that is that sometimes that Spanish teacher was giving her a pass to leave the class. Sometimes she was being reported absent, and in a lot of those absences, she was absent all day long. She wasn't at school during those time periods. But alleging that there were occasions during the school where she was in McCutcheon's classroom when she shouldn't have been, okay, I'll accept that from the pleading, but she hasn't tied that into these defendants, one, to even show that they knew that she wasn't a student of his, or two, that seeing them was so, you know, she doesn't allege that they were walking down the hallway in some manner in which Coach McCutcheon was holding her hand or his arm around her waist or shoulders that would give some indication of physical contact that might be inappropriate. It's simply that they were walking down the hallways or they were sitting chair to chair. The reputation, I didn't deal with that, but opposing counsel raised that one of the allegations is that they knew about his reputation for liking young African-American females, and yet there's nothing else pled to that. So I would submit that's a conclusory allegation that can't be accepted for the truth. Chair to chair businesses, that really doesn't complete the picture. It's the chair that's placed up beside the teacher in front of the entire class, so it's not only is she sitting knee to knee, but it separates her from the other class itself, and I understand the allegation was done repeatedly, and that would be highly visible to the people walking down the class, walking up and down the halls, et cetera. Including her own mother, who saw that and didn't draw any inference that it was a sexual abuse situation. Well, but you have the defendants asking, well, I hear rumors of sexual conduct out there, and she comes in and denies that she's pregnant with this guy. You don't ask questions about that, and if you took the total picture, you get a sense that someone's not paying attention. Now, that doesn't necessarily mean at some point you have to have a trigger to get to deliberate indifference, and that's the difficulty. I don't know whether it's here or not, but there's a lot of things missing here. These people were not being attentive to the school, whether that's... And that may be true. The school has had some academic issues as well that have been well publicized, but being an ineffective administrator or an inefficient administrator doesn't mean that any of these people had reason to conclude that this teacher was having a sexual relationship with this student. And when you boil it down to get rid of the conclusory allegations in the hyperbole and look at what's actually been alleged for each one of these appellants, it isn't going to be sufficient under ICPAW. Thank you very much. Thank you, Mr. Grover. Your case is under submission. The last case for today, Paul v. Sharpton.